Good morning, your honors. Good morning. May it please the court. Elizabeth Richardson-Royer on behalf of the appellant Kelly Gearhart. I plan to reserve three minutes for rebuttal. I'll try to watch the clock. The briefing in this case raised a number of errors and I'm happy to discuss any of them that your honors wish to discuss, but I thought I would this morning focus on the procedural errors that occurred at sentencing and in the restitution proceedings. First I want to give just sort of an overview. And we have one conceded error, right? We have one conceded error. And that is on the 168 months as to the money laundering? Right. As to count 15, the statutory max is 120 months. So just sort of an overview in this case, the plea agreement had a really limited factual basis. Mr. Gearhart pleaded guilty to making representations in 2007 to private investors that he approached to buy lots within the Visa Del Ombre development. And that was what the factual basis was in the plea agreement. So the district court was tasked with, in order to determine the sentence and the restitution, finding out what the relevant conduct was, how many additional victims there were, what the additional losses were. And I think the problem that happened in this case that led to a number of these procedural errors that the district court felt like there's a plea agreement here, I have a plea, I'm kind of done, and failed to do the factual weighing and fact-finding that was necessary. I would agree with you, and I'm not speaking for anyone else, that this is not a model of clarity in terms of addressing all the points that were raised below. But I suppose I'm having a little bit of a hard time with everything that I look at in the entire record, seeing why he couldn't do exactly what he did. Well, the first error that I don't see how it's not an error, is where the court looked first at the initial PSR's 29 offense level, which had been abandoned by the probation office by then, and then looked at the government's argument for additional victims, which would take it to an offense level of 33, listened to the government's argument on that point, said, I know there are more increased it by four levels for, you know, no discernible reason. There's no enhancement that should have applied. The court found it wasn't shown by clear and convincing evidence. Let me ask you about the letters. All right, the the court read a lot of letters, and I think made a comment about, well, I find them quite moving because there were elderly people involved in all of that, and then those people weren't ultimately identified as victims. Is that because those people weren't victims, or is what's the, were they, did they get full restitution? That wasn't clear to me. It sounded like they still were out money. There were, there was a dispute, which my contention is the court needed to resolve and didn't, about who was a victim in this case and who wasn't. So Mr. Gearhart didn't dispute that the people that he spoke to directly and the people that he approached to buy property in 2007 were victims. The government's position was that all of the investors who invested through Hearst Financial in the Vista del Hombre project, that every single one of those investors was a victim, and, and that hasn't been shown by preponderance of the evidence or clear and convincing evidence in this case for a number of reasons. But you don't dispute that they could have brought, that they could have done more to establish that at the sentencing hearing? Because I think the PSR set out that there were certain things that factual determinations needed to be made, and you're saying they weren't made, but they could be made possibly. The probation officer found that even with respect to the 17 victims that had been, you know, identified in the first PSR, that even with those victims there were evidentiary disputes that had to be resolved through a hearing. And then the, the, the probation officer found that with respect to all these other victims, we call them the HFC investors, that there just wasn't sufficient proof at all of a connection between Mr. Gearhart and those victims. And, and that's because most of those victims invested in 2005. And at that point, that's when Mr. Gearhart bought the property. He did a ton of work after that to develop the property, and it's not at all clear from the record that he was involved in any fraud at that point, that he made any misrepresentations, that he knew about Jay Miller's representations in 2005. So those people, according to the probation officer and the defense, were not victims. And, and, you know, they weren't deemed victims for purposes of the enhancement, but then the court, you know, increased the offense level by four levels anyway, just as if they had been victims, although he found that they weren't. And there's, so that increased the guideline range, this four-level enhancement, departure, whatever you really want to call it, and there's some the court did. It increased the guideline range from 87 to 108 months to 135 to 168 months for, for basically no supportable reason. And that error in and of itself is a reversible error that really can't be ignored, I think. The court also made a number of violations of Rule 32. There were things in the PSR that the defendant objected to below. The probation officer actually, actually backed off of a number of those factual statements and said, you know what, you're right, there are credibility issues with respect to these potential victims. There are issues about whether the banks were aware of, you know, what the trustee they were getting was, and we have to have these issues resolved. And the court, the court didn't resolve those issues, despite the fact that Mr. Gearhart raised objections to what had been in the initial PSR, and those were factual determinations that had to be made and they were never made. Well, let me ask you this. If, let's say, let's say we agree with some of your contentions and we send it back to do certain things, what, is it possible your client could get more time without it being retaliatory if the hearings actually went forward and it looked worse? I don't think it could look worse. I think he got, well, you know, and above... One never knows. I mean, that's... A court could always impose more time. It would certainly look retaliatory, you know, given that the probation officer and the defendant thought the appropriate guideline range was 57 to 71. The government was arguing for a low-end sentence. It would not look great. Right, but the agreement, what was the agreement to? The agreement was not to a specific sentence. Okay. You know, the parties agreed on a number of the factors. They disagreed about the loss amount. And the number of victims as well. And the number of victims. So, but, but what I'm saying is he already got the enhancement that would have corresponded to the government's argument for the number of victims. Although the court found it wasn't true. He probably wouldn't get more, but it seems like he could. I don't, I mean, any, anytime we send a case back, somebody could get more, but... I know, but that's something... On the facts of this case... No good deed can go unpunished sometimes. Well, on the facts of this case, and if you look, you know, into the evidence, I think that the government can't show that all these people were victims. They weren't all recorded on the 2007 trust deed. The only evidence that Mr. Gearhart knew anything about Jay Miller's initial fraud comes from Jay Miller himself, and even he doesn't go so far as to say, you know, we were in on this together. The scope of the undertaking simply didn't involve, you know, the 2005 procurement of investments. So, in terms of Mr. Gearhart's ability to repay, it does not appear that he will have the means to repay most of the restitution, in this case, as it is ordered. Thus, assuming for a moment that the district court erred in calculating the amount of restitution, how exactly is he prejudiced? Well, the defendant's ability to pay is not an appropriate And the statute itself says that, that the court should not consider the defendant's ability to pay. And so, if his inability to pay means that the court can order whatever restitution it wants, I think the statute, you know, has to be thrown out. If I could ask about your client's background in preparing for this case, I was struck by the fact that he's had a lot of bad things happen to him, wholly aside from this case. I was curious, when did the district court talk about that or consider that? Did he get sentencing? The district court didn't. The district court, below Mr. Gearhart, argued that he should receive a 57-month sentence, which, you know, it's rare that somebody doesn't argue for a below-guideline sentence. But he said, you know, I'm willing to do it. I take responsibility. You know, he's really a straight shooter. And part of the reason for that low-end sentence was because... Maybe later a straight shooter. I don't know that he gets that classification for this whole offense. Throughout his life, his reputation and everyone who dealt with him until 2007 thought that he was really a straight shooter. So, I think it's fair to say that when we're talking about his background. But, you know, his childhood and, you know, having sort of worked his way up and giving back and all these things, you know, the death of his son, all these things around, you know, his mother left, you know, he was sort of stuck with this alcoholic father who he had to support as a teenager. All of this was brought before the district judge who totally ignored it. And the district judge, you know, when looking at the 3553A factors, you know, gave lip service to them. And I, you know, don't want to steal my colleague's argument from earlier, but, you know, said, I considered these factors, but then, you know, clearly didn't. Never mentioned them, never gave them any attention whatsoever, and only considered the factors that the court cared about, which was, you know, the harm and the nature of the offense and things like that. And so, you know, aside from all of the procedural errors in this case and the court's refusal to make the factual findings that were required, the court's refusal to look at proximate cause of restitution, the bottom line is the sentence is substantively unreasonable for, you know, the reasons that Your Honor points out about Mr. Gearhart's background. This is not a typical Ponzi scheme. This is not a typical fraud offense. Even the government conceded that Mr. Gearhart, you know, for many years, had a legitimate business. Well, if we find procedural error, we don't have to get to the substantive error, right? You don't, Your Honor. Although I would, before I reserve the remainder of my time, if there's a procedural error that Your Honor's find that's the basis for vacating the sentence and remanding, I would ask that the case be reassigned to a different judge because of all the errors in the judge's adamancy in refusing to make the factual findings necessary in this case. I'll reserve the rest. That's a fairly unusual remedy. Did you ask for that in your brief? I can't recall. I did. Okay. I can discuss that. All right. We'll reserve. You want to reserve the rest of your time? I would like to. Okay. Thank you. Good morning, Your Honors. George Cardona for the United States. So to start out, I will agree that, you know, were I asking the judge to do sentencing, he could have explained it better. But that doesn't mean that there are procedural errors here. And there are a number of things I'd like to start with. First off, in terms of what the court actually did, if you look at the record as a whole, I believe the record actually demonstrates what the court did. It made a finding under clear and convincing evidence standard that the number of victims was more than 10, but was not, as the government was urging, more than 250. And as a result, it found the guideline basis, the guideline offense level, to be 29. And that's clear. Indeed, at a later point in time, the government, which was making its recommendation, which was tied to the offense level under the plea agreement, made clear that based on the court's finding of 29, which set a range with a high end of 108, it was recommending the high end. The plea agreement varied the government's recommendation based on the offense level that the court found. And indeed, the defense counsel at sentencing, at a number of times, asked the court, so is the court finding only 17 victims, not over 250? And the court responded, yes. What the court then did was, it then looked at the 3553A factors. And in particular, if you look at exactly what the court said, when it basically went, applied what the defense in their reply brief characterizes as a departure, I would argue that it's a variance. But whether it's a departure or a variance under this court's case law, doesn't really matter. But in any event, what the  One of the things in here, though, there's a lot of things in here that trouble me on some level. That, first of all, the letters that you have. And so, it's, what are we to make of the district court's comment that he was greatly touched by the stories of elderly investors, and none of them were found to be victims. So, what do we do about that? That's not necessarily true. The court had a range of victim letters that both parties agreed the court could have presented to it, subject to its subsequent determination as to who would be victims. So, were they victims? There were two sets. There were, it depends on how you view victim. In terms of the victims that the court considered for purposes of applying the victim enhancement under the fraud guidelines, it found by clear and However, later at restitution, it found under a preponderance that the number of victims was far broader. And for restitution purposes, encompassed all of the more than 250 investors in VDH. And I can explain to the court why that's a finding supported by the evidence. Well, it looks like it lumped in the banks, too. Yes. So, but if you look, Gerhardt objected to the pre-sentence report contention that the two banks in the case were victims. Yes. On the ground that they were aware of partial conveyances of the property at issue. So, it would seem according to Rule 32 of the Federal Rules of Criminal Procedure, a sentencing court is to rule on all disputed facts and say, or say that such a ruling is unnecessary. I can't find where the district court did any of that. The court did not do that. But again, you have to look at the specifics and you have to look at this court's decision in Petrie, which the defense doesn't address. And this court's decision in Petrie was the case in which this court addressed the 2002 amendment to Rule 32. And that Rule 2002 amendment added language, controverted matter. What this court said in Petrie is that when we look at the purpose and language of the legislative amendment to Rule 32, what we conclude is that the purpose of that was to narrow it. And what Petrie held is that after that amendment, the court's findings under Rule 32 is limited to one, where there are factual objections to the pre-sentence report, and where those specific, yes, as to certain things, but I'll get to that in a second, and those specific factual objections have to make a difference in the formulation of an appropriate sentence. So, let's take for a moment the factual objection as to whether or not Heritage Bank was aware of the partial reconveyances. The first problem with that is that there's no statement in the PSR regarding that. The PSR does not say Heritage Bank was aware or wasn't aware. There simply isn't a statement, and so that is not a specific factual objection to a fact stated in the pre-sentence report. The second thing is, it didn't matter. The government's theory was not that Heritage Bank was not aware of the reconveyances. The government's theory was, those reconveyances were what Mr. Miller did to clear title, so that the title report looked like those interests that had been granted to the investors had been reconveyed back to Mr. Gearhart. But as Mr. Miller admitted in his plea agreement, under oath in his factual basis, which was submitted to the court, Mr. Miller stated, I did that as a fraud, knowing... A sham, that's... There was a sham. There was a sham reconveyance, and not only that, in his plea agreement, he stated, Kelly Gearhart was aware of that. So that's the evidence in the record that supports your position on that? That, and one other thing, which is, again, even though Mr. Gearhart's plea was limited, what he admitted doing in his plea basis, in his own plea basis, was promising to sell certain lots, in particular lots 16, 17, and 18, as well as 15, 21, and 22 to two And then, as he admitted in his plea agreement, after promising to sell those to those individuals, he then went ahead and pledged those lots to the banks. Now, the defense argues that if I promised the lots, and those weren't recorded, so there was nothing to show that those existed, those promises, and those were never disclosed to the bank. Now, he argues in his reply brief, that if I promise a lot to A, but I don't deliver it, and then I pledge it to the bank, that's not a fraud on the bank, because it's a fraud on the person I promised to, but because I didn't deliver it, I can then pledge it to the bank. That makes no sense. What the bank's problem was, that he got these lots thinking they were free and clear, when in fact, Mr. Gearhart, as he admitted in his plea agreement, had already promised those lots, and collected money for those lots from these other individuals. So for both those reasons, the evidence supported the banks being a victim, without regard to whether they were aware of the partial reconveyances, which is why the PSR doesn't rely on any knowledge regarding the partial reconveyances, and doesn't say anything about it. And the same thing is true, if you go through, in their brief, they objected to nine specific failures of the court to make findings. For many of those, the PSR doesn't contain a factual statement, and so there's no obligation under Rule 32, and for the remainder of the case, to make a difference. It wasn't a fact that made a difference in the formulation of an appropriate sentence. Let me ask you about the restitution. What evidence in the record shows that 2005 investors listed on the FBI's spreadsheet invested their money after Gearhart's fraud was in place? If these investors invested before the fraud arose, why are they entitled to restitution? There was some limited information, primarily from Miller and Bard, and statements by them in their testimony that Gearhart was involved in the fraud. But put that aside for a second, because the court didn't make findings as to that, and I agree that as to that prong, if the court was going to rely on it, it needed to do something. But, again, we come back to the fact that the fraud on which the government focused was the multiple pledging of the lots, and Mr. Gearhart's 2007 pledging of those pledging of lots that had already been pledged to individual victims, both in 2005 and in 2007. Then in 2008, he goes and he re-pledges those lots and or resells certain of those lots, even though they had already been pledged to security. And so, as an example of that, if the court wants an example of that, one of these 17 victims that the court found was a woman named JG, and she made her investments in 2005, and she got security interests under the 2005 deed of trust. And in connection with that 2005 deed of trust, the defendant himself signed certain documents pledging to her, acknowledging that she had been granted interests in two particular lots, 26 and 27. Now, maybe that wasn't fraudulent at the time, okay? But then, in 2008, after having pledged these lots to her in 2005, Mr. Gearhart goes ahead and pledges those exact same lots to support additional loans to Heritage Oaks Bank. And that is a fraud. Mr. Gearhart's subsequent fraudulent conduct deprived that victim of her security interests and deprived a whole host of other victims, all of the 2005 victims who had received pledges of interest in this parcel of property that was divided up into subsequent lots, many of whom received specific pledges as to specific lots, deprived them of those interests. And that's why they were victims for purposes of restitution. The defendant's fraudulent conduct in 2007, with the multiple pledging of those lots, caused them the losses, and that was the proximate cause, and that's why they were victims. But the court clearly articulate that, or are you doing a better job than the court did? I will take credit for doing a better job than the court did, but I think if you read the record as a whole, that was the thrust of the government's arguments, and that was the thrust of the findings. Now in connection with restitution, what I also need to point out is this. The real issue for purposes of restitution, the only issue that the parties pushed the court to make a finding on, with some exceptions, was how many victims were there? Was he going to say that there were more than the 200, that it was all the VDH investors or not? Once the court made the determination that was all the VDH investors, the defendant, while reserving all the arguments they had made previously and in connection with the defendant and the government, got together and put together a joint status report that was submitted to the court, and dueling restitution orders. And so the parties put forward their own points of view as to how various credits and other things should be applied. And ultimately, the court adopted the defense's position in connection with that restitution. So once the court made a finding that there were more than 250 victims for restitution purposes, which I believe is supported by the record for all the reasons I've said, after that, the parties essentially arrived at their agreement as to credits and other things. So again, I think the record supports what the court did in terms of restitution. Let me ask you, counsel will probably most likely be saying in more detail, but let's say we don't agree with you on every point that you've argued and we feel that there's a need for, there were certain procedural errors that either need to be further developed or clarified. Should this be assigned to a different judge? I don't believe that's necessary. And I think the cases that are cited by the defense are distinguishable. You know, if you look carefully in context at the comments that the court made, while I don't disagree, you know, again, if I were the judge, I would probably refrain from making some of those comments. But if you look at them in context, I don't think they demonstrate either a personal bias against either the defendant or his counsel, or that basically the court would have difficulty putting aside anything that this court required him to do that it hadn't done. Could Mr. Gerhart get more on a remand? In theory, he could, if there were additional evidence presented. Now the government would abide by its plea agreement and recommend in accordance with that, you know, depending on the offense level found. But, you know, if there is a possibility that the court, looking at the evidence, could conclude that clear and convincing evidence provided a basis for finding more than 250 victims, particularly since there is additional evidence the government could introduce to support that. How do you get around the proposition that this case has to be vacated solely because the concurrent sentence produced a guideline sentence on one count? In terms of that count, I think the court has a number of options in what it does. I don't think it has to vacate and remand for an entire new sentencing. There are a number of cases where this court has, in fact, limited its remand and given instructions. So there are a number of options the court could have. One option might be, in some instances, this court has actually redirected the sentence itself, where it's clear that it was just an error. It's clear that the court meant to impose 168 months. The simple problem is that 168 months on count 15 exceeds the 120-month statutory maximum. But if he hadn't run them concurrently, he could have formulated a sentence where he sentenced consecutively on the counts and got to the 168 months within the statutory maximum. He could have, but I think the intent of the court was basically to impose concurrent sentences at 168 months. So I think with that intent, it would be fair in this case, as the court has done in some other cases where it simply corrected it itself, where it's clear it was just an error. Could say simply, we're going to correct the judgment to read 120 months on count 15. Alternatively, if the court believes it wants the district court to do that in the first instance, the court could remand only on that count with instructions to reduce to the statutory maximum, or could vacate with simply re-sentence on that one count if the court wants to leave open to the court the option of doing something other than 120 months. So I think those are all options, but I don't think you need to remand it for an entire new re-sentencing. And I think that type of limited remand would make much more sense given, in particular, the volume of the record, the volume of the arguments, the volume of the briefing. I don't think there's any reason to force the district court to go through that all again, simply to correct what was right. Unless my colleagues have additional questions, you have about 20 seconds to wrap up. What I'd like to do just briefly is address the victim letters, which the court started with, because if you look at the victim letters, that was the basis for the court departing upward four levels, and the court explained that that was based on the egregious harm that these victims had suffered. And I just want the court to recognize the guidelines recognize that itself as an appropriate basis for a departure. It was harm outside the economic harm, and that provided a valid basis. And indeed, as I've explained in my brief, by analogy, a four level variance on that basis is entirely within the sweet spot for that type of variance or departure. Thank you for your argument. Rebuttal. Thank you. First, I want to address counsel's argument that when the court went up four levels, it was a variance, not a departure, and it just wasn't. A variance is where a court, you know, picks a sentence that's outside the guideline range, and here the court increased the offense level to the guideline range, and so this is not a variance. And, you know, to the extent counsel's saying, well, it could have been a variance, and that would have been okay, then why have the guidelines at all? I mean, if a court can just, you know, say, well, this enhancement is not warranted, but I'm just going to increase the guideline range to whatever I want anyway, then, you know, we might as well just throw it out and only review for substantive reasonableness. But we do still care about how a court calculates the guideline range, and in this case, there was no basis for that four-level increase. Just quickly with respect to the, Your Honor asked about, you know, were all the people who submitted these letters and who spoke in court deemed victims? And at sentencing, the answer is clearly no. Many and most of them were deemed not to be victims, and it was almost a sort of bait-and-switch, because when they were called to testify and when the letters were submitted, Mr. Gearheart said, you know, I have no doubt that the court won't consider these if these people aren't victims. And the court was like, yes, yes, I understand. How are you defining victim? For purposes of sentencing, a victim is, you know, one that the court deems to be a victim. Well, does that mean economic, or does that mean that it didn't emotionally affect them, or? Well, there's a definition which I can find, but it is someone who has suffered some part of the loss, I think some part of the actual loss. And the court said these people, you know, the government didn't show that these people suffered part of the actual loss by clear and convincing evidence. They're not victims for sentencing. And despite the fact that the defendant only allowed these people to testify with the understanding the court wouldn't consider them if they weren't victims, then the court clearly did consider them, which is sort of, you know, if the court hadn't agreed to the condition, then Mr. Gearheart would have objected more strenuously to them speaking. I want to speak quickly about the Rule 32 error and the Heritage Oaks Bank, because the government argues that there wasn't anything in the PSR that said Heritage Oaks Banks didn't know about the reconveyances. I don't think it has to be quite that specific. In paragraphs 53 and 54 of the PSR, the court misrepresented that he owned the property, that he represented it was unencumbered. And it was in response to those statements that Mr. Gearheart came back and said he didn't misrepresent that it was unencumbered because the banks knew when they had the documents in front of them that there was a prior trust deed. The trustee was listed. The trust deed was known. And that's the factual dispute that the court was required to address, because it did matter whether they knew. Because if you look at the contract between Mr. Gearheart and HOB, you know, it says that title is clear to the extent except, you know, revealed on the title report. And there are remedies in there for if a title is not clear. But, you know, the Heritage Oaks Bank was aware that those prior trustees existed, and that's what the government argued below meant that he defrauded them. And even the Heritage Oaks Bank's representative said... All right, you need to wrap up. You've gone into overtime. Okay. Anyway, he said that he knew that... I want to find it. He said... Well, you need to find it quickly. He knew that the 110-acre plot was leveraged to the hilt, which was typical in hard money deals. So HOB's knowledge was in dispute, and it needed to be resolved. All right. Thank you. Thank you both for your arguments. This matter will stand submitted.
judges: Callahan, Owens, Faber